# In the United States Court of Federal Claims

Nos. 20-1300 & 20-1318 (consolidated)

(Filed Under Seal: January 13, 2021)
(Reissued January 22, 2021)

|  |  |  |
|---|---|---|
| **HARMONIA HOLDINGS GROUP, LLC,** | ) ) ) | Post-award bid protest; standing; untimely challenge to a term of the solicitation; agency's determination of technical factors; agency's best value decision. |
| Plaintiff, | ) ) ) |  |
| **and** | ) ) |  |
| **SNAP, INC.,** | ) ) |  |
| Consolidated Plaintiff, | ) ) |  |
| v. | ) ) |  |
| **UNITED STATES,** | ) ) |  |
| Defendant, | ) ) |  |
| **and** | ) ) |  |
| **KARSUN SOLUTIONS, LLC,** | ) ) |  |
| Defendant-Intervenor. | ) |  |

Jon D. Levin, Maynard, Cooper & Gale, PC, Huntsville, Alabama for plaintiff Harmonia Holdings Group, LLC. With him on briefs were W. Brad English, Emily J. Chancey, and Michael W. Rich, Maynard, Cooper & Gale, PC, Huntsville, Alabama.

Alexander J. Brittin, Brittin Law Group, PLLC, McLean, Virginia for plaintiff Snap, Inc. With him on briefs was Mary Pat Buckenmeyer, Dunlap Bennett & Ludwig PLLC, Vienna, Virginia.

Ioana Cristei, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. for the United States. With her on briefs were Jeffrey Bossert Clark, Acting Assistant Attorney General, Robert E. Kirschman, Jr., Director, and Douglas K. Mickle, Assistant Director, Civil Division, United States Department of Justice, Washington, D.C., and Charles G. McCarthy, Assistant Regional Counsel, United States General Services Administration, San Francisco, California.

Rebecca E. Pearson, Venable LLP, Washington, D.C. for defendant-intervenor Karsun Solutions, LLC. With her on briefs were J. Scott Hommer, III, Venable LLP, Tysons, Virginia, and Christopher G. Griesedieck, Krista A. Nunez, and Taylor A. Hillman, Venable LLP, Washington, D.C.

## **OPINION AND ORDER**[1]

LETTOW, Senior Judge

Pending before the court in this pair of consolidated bid protests are competing motions for judgment on the administrative record. Plaintiffs Harmonia Holding Group, LLC ("Harmonia") and Snap, Inc. ("Snap") protest the General Services Administration's ("GSA" or "the agency") award of a contract for the Dashboard Rationalization Project, solicitation number 47QFPA20Q0008 ("call order 2"), to Karsun Solutions, LLC ("Karsun").[2] The court finds that the issues raised by Harmonia and Snap are without merit. Therefore, Harmonia's and Snap's motions for the judgment on the administrative record are DENIED, and defendant's and Karsun's cross-motions for judgment on the administrative record are GRANTED.

## **BACKGROUND**[3]

### *A. Solicitation*

Call order 2 was issued on August 4, 2020, pursuant to the Enterprise Data Information Management Blanket Purchase Agreement which was previously awarded to six companies,

---

[1] Because of the protective order entered in this case, this opinion was initially filed under seal. The parties were requested to review the decision and provide any proposed redactions of confidential or proprietary information. The resulting redactions are shown by asterisks enclosed by brackets, *e.g.* "[***]."

[2] Snap has also filed a motion to supplement to court record. Pl. Snap's Mot. to Suppl. the Ct. R., ECF No. 45. Snap seeks to include a declaration from Snap's President and Chief Executive Officer Navneet Gupta to support its arguments as to the "irreparable harm, the balance of harm, and the public interest injunctive relief factors." *Id.* at 1-2. Mr. Gupta's declaration was included with Snap's prior application for a temporary restraining order and motion for preliminary injunction. *See* ECF No. 28-2. Snap's motion is GRANTED, and Mr. Gupta's declaration shall be included in the court's record for consideration as to the question of injunctive relief only.

[3] The recitations that follow constitute findings of fact by the court from the administrative record of the procurement filed pursuant to Rule 52.1 of the RCFC. *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005) (specifying that bid protest proceedings "provide for trial on a paper record, allowing fact-finding by the trial court").

including Harmonia, Snap, and Karsun.[4]  AR 19-379.[5]  Through call order 2, GSA sought to "modernize and innovate the Federal IT dashboard . . . and Digital Dashboard." AR 19-386. Specifically, call order 2 was "for backend system development, operations and maintenance, data management, data transformation, data integration, IT Security Support, and data analytics for the Federal IT dashboard." AR 19-386.  Section 3.0 of the solicitation detailed the agency's requirements for the contract, *see* AR 19-388 to 395, and the agency instructed offerors to "identify and describe beneficial and comprehensive methodologies and techniques to be used in fulfilling the [identified] objectives and requirements," AR 19-380.  The solicitation set the period of performance at "a one-year base period plus four, one-year options" running from September 2020 to September 2025.  AR 19-379.

Offers would be evaluated on two criteria: technical/management approach and price. AR 19-381 to 382.  GSA stated that it would consider "both price and non-price factors" to come to a "best value determination."  AR 19-381 (internal quotations omitted).  The solicitation noted that while the technical/management approach factor was "more important than cost-price[,] . . . as technical ratings become more equal, price will increase in importance in the award decision." AR 20-440.  The offerors' technical ratings would be accessed as excellent, good, satisfactory, or unacceptable, and the agency would "cit[e] significant strengths, strengths, weaknesses, significant weaknesses, and deficiencies" as appropriate.  AR 19-382.  Price would be evaluated "to determine if it is fair, reasonable and within the limits of the offerors[' blanket purchase agreement]."  AR 19-382.

As to price, the solicitation required offerors to submit a pricing narrative and complete a price workbook.  AR 20-440.  The workbook listed three Contact Line Item Numbers ("CLINs") for the base year and four CLINs for the option years.  AR 19-403 to 405.  For all CLINs but those titled "Operations and Maintenance," offerors were to show a predetermined price (a "plug number") in lieu of a proposed price.  AR 19-403 to 405.  The plug numbers totaled $24,716,469 over the five years.  AR 21-481 to 486 (Amendment 2 of the Pricing Workbook).

### B.  Offers, GSA's Evaluation, and Award Decision

GSA received offers on August 18, 2020 from all six companies covered by the blanket purchase agreement.  AR 40-1060.  Each offer included a technical quote and a price quote as required by the solicitation.  *See, e.g.*, AR 27-622, 706 (Harmonia); AR 28-713, 772 (Karsun); AR 29-782 (Snap).  Harmonia offered a price of $33,185,930.90, AR 27-710; AR 40-1073, Snap's price quote was $32,510,534.16, AR 29-848; AR 40-1073, and Karsun offered a price of $34,692,163.08, AR 28-778; AR 40-1073.

---

[4] GSA issued four amendments to the solicitation for call order 2, on August 5, 2020, August 12, 2020, August 14, 2020, and September 20, 2020, respectively.  *See* AR Tab 21; AR Tab 22; AR Tab 23.  As a result of the first three amendments, the agency extended the deadline for responses to August 18, 2020.  AR 22-487.  All offers were submitted on that day.  AR 40-1060.

[5] The Administrative Record will be cited as "AR Tab - Page Number."

3

GSA considered each company's proposal for technical capability and price. AR 40-1060 to 1076. Karsun received an overall technical rating of excellent, while Harmonia and Snap received technical ratings of good. AR 40-1063. The three other offerors received a rating of satisfactory. AR 40-1063. The agency assessed that Karsun's technical proposal had two significant strengths, thirteen strengths, and zero weaknesses. AR 40-1067. Harmonia was assessed zero significant strengths, seven strengths, and two weaknesses. AR 40-1067. GSA determined that Snap's technical proposal had zero significant strengths, eight strengths, and three weaknesses. AR 40-1067. In sum, the parties' proposals were rated as follows:

|         | Significant Strengths | Strengths | Deficiencies | Weaknesses | Rating    |
|---------|-----------------------|-----------|--------------|------------|-----------|
| Karsun  | 2                     | 13        | 0            | 0          | Excellent |
| Snap    | 0                     | 8         | 0            | 3          | Good      |
| Harmonia| 0                     | 7         | 0            | 2          | Good      |

GSA also evaluated each offeror's price quote. AR 40-1068 to 1073. The agency looked at the extent to which prices deviated from the government's independent cost estimate, the annual escalation rate in price between the base year and the option years, and the hourly labor rates discounts. AR 40-1068 to 1073. After evaluation, the agency determined that "all [offerors'] price quotes [were] fair and reasonable, and within the limits the [blanket purchase agreement]." AR 40-1073.

The agency next conducted a tradeoff analysis to determine which offer was the best value to the government. AR 40-1073. The contracting officer determined that "Karsun provided a technical quote that significantly exceed[ed] all technical requirements" and demonstrated "a superior understanding of all technical requirements." AR 40-1075. Due to Karsun's "multiple strengths that . . . significantly benefit[ed] the Government[,] . . . [t]he contracting officer . . . determined that there [was] sufficient justification for the Government to select a higher priced quote based on the tradeoff rationale." AR 40-1075 to 1076. Therefore, GSA determined that Karsun's offer represented the best value to the government and awarded the contract to Karsun. AR 40-1076. Karsun, Harmonia, and Snap were notified of the award decision on September 23, 2020. AR 41-1077; AR 42-1082 to 1085.

### C. *Procedural History*

Harmonia filed its complaint in this court challenging the award on October 1, 2020, and concurrently moved for a preliminary injunction. *See* ECF Nos. 1, 3. After Karsun moved to intervene, *see* ECF No. 13, Harmonia, Karsun, and the government agreed to a voluntary partial stay, *see* Joint Status Report, ECF No. 17. Snap filed its complaint in No. 20-1318 on October 5, 2020, and the court subsequently consolidated the cases. *See* Order of October 6, 2020, ECF No. 27. Snap objected to the partial stay and filed an application for a temporary restraining order and motion for preliminary injunction. *See* Snap's Appl. for a TRO & Mot. for a Prelim. Inj., ECF No. 28. Harmonia then renewed its motion for preliminary injunction. *See* Harmonia's

Renewed Mot. for Prelim. Inj., ECF No. 31. On November 6, 2020, the court denied Snap's application for the temporary restraining order and deferred both Harmonia's and Snap's motions for preliminary injunction to the merits. *Harmonia Holdings Grp., LLC v. United States*, __ Fed. Cl. __, 2020 WL 6687462 (Nov. 6, 2020).

On November 5, 2020, Snap and Harmonia each filed motions for judgment on the administrative record. Snap's Mot. for J. on the Administrative R. & Mem. in Supp. ("Snap's Mot."), ECF No. 46; Harmonia's Mot. for J. on the Administrative R. ("Harmonia's Mot."), ECF No. 48. Snap argues that the agency improperly assessed Snap with three weaknesses, failed to correctly evaluate Karsun's technical capabilities, and did not follow the solicitation's best value tradeoff requirement. Snap's Mot. Correspondingly, Harmonia argues that the agency acted arbitrarily when assigning Harmonia weaknesses, disparately evaluated the offeror's proposals, and used an irrational method of calculating the price totals. Harmonia's Mot.[6] On November 19, 2020, the government and Karsun filed their cross-motions for judgment on the administrative record. United States' Cross-Mot. for J. on the Administrative R. & Resp. ("Def.'s Cross-Mot."), ECF No 56; Karsun's Cross-Mot. for J. on the Administrative R. & Resp. ("Karsun's Cross-Mot."), ECF No. 57. The government and Karsun argue that Harmonia and Snap merely seek to challenge rational and reasonable decisions made within the agency's discretion. Def.'s Cross-Mot. at 16-43; Karsun's Cross-Mot. at 5-33. The motions have been fully briefed. *See* Pl. Snap's Reply & Resp. ("Snap's Resp."), ECF No. 59; Pl. Harmonia's Reply & Resp. ("Harmonia's Resp."), ECF No. 60; Def.'s Reply, ECF No. 63; Karsun's Reply, ECF No. 64. The court held a hearing on December 15, 2020, and the cross-motions are ready for disposition.

## STANDARDS FOR DECISION

### A. Jurisdiction and Standing

The Tucker Act confers on this court jurisdiction to "render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1).

Before reaching the merits, the court must determine whether the plaintiff has standing to challenge the contract award. The plaintiff has the burden of establishing standing. *See Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). "A party seeking to establish jurisdiction under § 1491(b)(1) must show that it meets § 1491(b)(1)'s standing requirements, which are 'more stringent' than the standing requirements imposed by Article III of the Constitution." *Diaz v. United States*, 853 F.3d 1355, 1358 (Fed. Cir. 2017) (quoting *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009)). To satisfy these more stringent requirements, a plaintiff must show that it is an "interested party," *see Digitalis Educ.*

---

[6] Both Harmonia and Snap also argue that the court should enter a permanent injunction against the award. Snap's Mot. at 24-28; Harmonia's Mot. at 24-26.

*Sols., Inc. v. United States*, 664 F.3d 1380, 1384 (Fed. Cir. 2012) (quoting *Rex Serv. Corp v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006)), and "that it was prejudiced by a significant error in the procurement process," *Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1378 (Fed. Cir. 2009) (citing *JWK Int'l Corp. v. United States*, 279 F.3d 985, 988 (Fed. Cir. 2002)).

An interested party is an "actual or prospective bidder[] or offeror[] whose direct economic interest would be affected by the award of the contract or by the failure to award the contract." *Weeks Marine*, 575 F.3d at 1359 (quoting *American Fed'n of Gov't Emps. v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001)). To have a direct economic interest, the plaintiff must show that it had a substantial chance of winning the contract. *See Digitalis*, 664 F.3d at 1384. An interested party suffers prejudice from a significant procurement error when "but for the error, it would have had a substantial chance of securing the contract." *CliniComp Int'l, Inc. v. United States*, 904 F.3d 1353, 1358 (Fed. Cir. 2018) (quoting *Labatt*, 577 F.3d at 1378) (emphasis omitted); *see also Red Cedar Harmonia, LLC v. United States*, 144 Fed. Cl. 11, 21 (2019), *aff'd*, ___ Fed. Appx. ___, 2020 WL 7418998 (Fed. Cir. Dec. 18, 2020). The prejudice inquiry and the economic-interest inquiry must not be conflated—"an error [may be] non-prejudicial to an economically interested offeror." *CliniComp*, 904 F.3d at 1380 (quoting *Labatt*, 577 F.3d at 1379-80); *Veteran Shredding, LLC v. United States*, 140 Fed. Cl. 759, 765 (2018) ("Despite the potential relevance of prejudice in determining substantial chance, direct economic interest should still be evaluated separately from prejudice."). A party cannot be prejudiced unless it first has a substantial chance of obtaining the award. *Veteran Shredding*, 140 Fed. Cl. at 765.

The government challenges Harmonia's standing, arguing that even if Harmonia's contended errors occurred, it was third in line for the award behind Snap and Karsun. Def.'s Cross-Mot. at 12-13.[7] Harmonia responds that "had the Agency not committed the complained-of errors[,] . . . Harmonia's Technical/Management evaluation would have been much closer to Karsun's, and the Agency would have recognized the large price premium Karsun's quote represented." Harmonia's Mot. at 13.

The court finds that as an actual bidder, Harmonia meets the first requirement of the interested party inquiry. *See* AR 27-622. Additionally, if the court accepts Harmonia's arguments about irrational assignment of weaknesses, unequal evaluation, and improper price evaluation as true, Harmonia would likely have been assessed a higher technical rating. With this higher technical rating and lower overall price, the agency could have found Harmonia to be the best value to the government. But for these alleged errors, Harmonia would have had a substantial change of being awarded the contract. Therefore, because Harmonia has a direct economic interest and was prejudiced by the alleged procurement error, Harmonia has standing to bring this challenge.

---

[7] Neither defendant nor Karsun argue that Snap does not have standing to bring this challenge. Defendant states that Snap was next in line to receive the contract award after Karsun, Def.'s Cross-Mot. at 13, and the court thus agrees that Snap has standing and will conduct no further analysis of Snap's ability to put forward its contentions.

### B. *Motion for Judgment on the Administrative Record*

The standards of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, govern the court's consideration of a protest of the government's decisions regarding the award of a contract. *See* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."). Under the APA, the court may set aside a government procurement decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), subject to the traditional balancing test applicable to a grant of equitable relief, *see PGBA, LLC v. United States*, 389 F.3d 1219, 1224-28 (Fed. Cir. 2004); *Hyperion, Inc. v. United States*, 115 Fed. Cl. 541, 550 (2014).

The court may not "substitute its judgment for that of the agency," *Hyperion*, 115 Fed. Cl. at 550 (quoting *Keeton Corrs., Inc. v. United States*, 59 Fed. Cl. 753, 755 (2004) (in turn quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds as recognized in Califano v. Sanders*, 430 U.S. 99, 105 (1977))), but "must uphold an agency's decision against a challenge if the 'contracting agency provided a coherent and reasonable explanation of its exercise of discretion,'" *id.* (quoting *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009)). "'[T]he deference afforded to an agency's decision must be even greater when a trial court is asked to review a technical evaluation' because of the highly specialized, detailed, and discretionary analyses frequently conducted by the government." *CSC Gov't Sols. LLC v. United States*, 129 Fed. Cl. 416, 434 (2016) (citing *L-3 Commc'ns EOTech, Inc. v. United States*, 83 Fed. Cl. 643, 650 (2008)) (additional citations omitted).

The court may overturn the government's procurement decision only "if '(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)). In conducting the rational-basis analysis, the court looks to "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion," *Axiom*, 564 F.3d at 1381 (quoting *Impresa Construzioni*, 238 F.3d at 1333), and affords "contracting officers . . . discretion upon a broad range of issues," *AgustaWestland N. Am., Inc. v. United States*, 880 F.3d 1326, 1332 (Fed. Cir. 2018) (quoting *Impresa Construzioni*, 238 F.3d at 1332-33); *see also Glocoms v. United States*, 150 Fed. Cl. 258, 265 (2020) (noting the agency's broad discretion to weigh factors in a best-value procurement). Accordingly, "the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Centech*, 554 F.3d at 1037 (quoting *Impresa Construzioni*, 238 F.3d at 1332-33). Protests alleging a violation of regulation or procedure "must show a clear and prejudicial violation." *Axiom*, 564 F.3d at 1381 (quoting *Impresa Construzioni*, 238 F.3d at 1333).

## ANALYSIS

### I. Harmonia's Contentions

Harmonia, in its motion for judgment on the administrative record, presents four main challenges: (1) the agency unreasonably assigned Harmonia weaknesses, (2) the agency disparately treated the offerors' proposals, (3) the agency's evaluation of price quotes was irrational, and (4) the agency's best value tradeoff analysis was unreasonable. *See* Harmonia's Mot. at 13-24. While the court will address each challenge in turn, the court ultimately finds that Harmonia's asserted errors do not present a basis for the court to overturn GSA's contract award decision.

#### A. Assigned Weaknesses

Harmonia first argues that "[i]t was irrational [for the agency] to assign Harmonia a weakness for proposing operations, maintenance, and upgrades to Drupal." Harmonia's Mot. at 14 (emphasis omitted). In its technical/management approach, Harmonia proposed providing "operations, maintenance, upgrades, and Drupal development." AR 27-633. Defendant, however, states that Harmonia "both overemphasizes . . . references to Drupal and misreads the [performance work statement]." Def.'s Cross-Mot. at 19. According to defendant, the solicitation's references to Drupal merely "give offerors a background of the existing technical architecture," but that "the Drupal work was completed under [a previous call order] . . . by another contractor." *Id.* Because the Drupal work was not part of the solicitation's requirements, the agency determined that its inclusion in Harmonia's offer "demonstrate[d] the fundamental misunderstanding that Harmonia had of the project," *id.* at 20, and assigned a weakness accordingly, AR 38-1036.

When considering the appropriateness of Harmonia's assessed weaknesses, the court must defer to the agency's discretion when the agency provides a "coherent and reasonable explanation," *Hyperion*, 115 Fed. Cl. at 550 (quoting *Axiom*, 564 F.3d at 1381), particularly when "asked to review a technical evaluation," *CSC Gov't Sols.*, 129 Fed. Cl. at 434 (internal quotations removed). The agency, in noting Harmonia's weakness, provided that the performance work statement "does not mention Drupal." AR 38-1036. As a result, the agency believed Harmonia "misinterpreted the requirement" and that misinterpretation could "increase risk to the government." AR 38-1036. While the solicitation does reference Drupal, it merely provides a description of Drupal's use in GSA's ecosytem, rather than dictating a specific requirement for a successful offeror under call order 2. AR 19-417.[8] The agency reasonably could have determined that Harmonia's emphasis on the Drupal development and maintenance

---

[8] The government's argument is bolstered by the inclusion of prior call orders in the Administrative Record. *See, e.g.*, AR 10-215 to 232 (call order 001). Call order 001 lists "Drupal Support," including the requirement that the contractor "[p]rovide operations, maintenance, upgrades and Drupal development" in the solicitation. AR 10-220. The solicitation for call order 2 includes no similar requirements. *See generally* AR Tab 19.

8

could present a risk to Harmonia's ability to complete other work actually required under the call order.

Harmonia also challenges the agency's assessment of a second weakness regarding Harmonia's proposed build development cycles. In its technical proposal, Harmonia stated that it would break software development "into three-month builds . . . composed of two-week sprints." AR 27-630. The agency determined that Harmonia's build schedule would require "development activities . . . without first understanding the epics of user stories that need to be developed or deployed." AR 38-1036. As a result, the agency found that the proposal "may not be a feasible and practical approach . . . [which] may increase the risk." AR 38-1036. Harmonia contends that the agency's "assessment rests on an unreasonable reading of Harmonia's proposal." Harmonia's Mot. at 16. However, the agency is entitled to believe that Harmonia's fixed, three-month build cycle were too rigidly structured to adequately respond to developmental requirements. *See* Def.'s Cross-Mot. at 21-22. Harmonia's challenge presents a disagreement with the agency's reasonable judgment, to which the court must defer to in these circumstances. *See Hyperion*, 115 Fed. Cl. at 550. Therefore, the court finds that the agency did not act irrationally when assigning these weaknesses to Harmonia's offer.

### B. Disparate Evaluation

Harmonia next argues that the agency engaged in disparate evaluation of Harmonia's, Snap's, and Karsun's proposals. Harmonia's Mot. at 17-19. Specifically, Harmonia notes that the agency assigned Karsun and Snap strengths that were not assigned to Harmonia. *Id*. Agencies awarding contracts are required to give "impartial, fair, and equitable treatment" to all government contractors when evaluating proposals. 48 C.F.R. § 1.602-2(b). When a party challenging a contract award argues that it was disparately evaluated by the agency, the party must show that "the agency unreasonably downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals" or "that the agency inconsistently applied objective solicitation requirements." *Office Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020) (citations omitted). If a protester meets the "substantively indistinguishable" standard, "a reviewing court can . . . comparatively and appropriately analyze the agency's treatment of proposals without interfering with the agency's broad discretion." *Id*. at 1373 (citations omitted). If the protester does not meet the standard, the court should defer to the agency's judgment and "dismiss the claim." *Id*.

Karsun was assigned a significant strength for its "Quality Control Plan . . . for monitoring agile software development," which the agency determined "demonstrate[d] a comprehensive understanding of agile software development and significantly increase[d] the probability of successful performance of the requirement." AR 38-1047. Harmonia contends that because it also included a two-and-a-half-page proposal for data quality control measures, it likewise should have been awarded a significant strength. Harmonia's Resp. at 13-15. However, the question relevant to the court's consideration is not whether both offers contain a similar proposal, but rather whether those proposals are "substantively indistinguishable." *Office Design Grp.*, 951 F.3d at 1372. While Harmonia included data quality control measures in its proposal, those measures had distinct differences from Karsun's proposal. For example, Karsun provided performance metrics for numerous task areas that were not similarly reflected in Harmonia's

9

proposal.  *Compare* AR 28-769 to 770 (Karsun), *with* AR 27-651 to 653 (Harmonia).  These proposals, therefore, were not identical or nearly so, rendering Harmonia's disparate-impact claim meritless.  The agency was entitled to prefer one proposal over another, and the court is not permitted to displace the reasoned, discretionary judgment of the agency.

      Harmonia next challenges two strengths awarded to Karsun for "using AWS cloud services, AWS Glue, . . . and a CI/CD pipeline for [***]."  Harmonia's Mot. at 18-19.  Karsun's offer discusses Karsun's proposed use of AWS, AR 28-722 to 725, which GSA found would lead to "successful performance" of the contract requirements, AR 38-1047.  Like Harmonia's prior contention, the discussion of AWS in Karsun's proposals is not substantively similar to that in Harmonia's proposal.  Karsun was awarded a strength for the specifics contained within its proposal, such as the use of "AWS cloud services for [***]."  AR 38-1047.  This strength reflects Karsun's proposal for data transformation, management, and integration.  *See* AR 28-722 to 723.  While Harmonia also references AWS products in its proposal regarding data transformation, management, and integration, AR 27-625, 630, 635, Harmonia does not propose using the AWS products for [***].  Similarly, Karsun's proposal to use the CI/CD pipeline for [***], AR 28-723, for which it received a strength, AR 38-1047, is not reflected in Harmonia's proposal.  Specifically, while Harmonia proposes using the CI/CD pipeline, that discussion does not include [***].  *See* AR 27-652.  These proposals are not substantively similar and, thus, Harmonia's disparate evaluation argument fails.

      Harmonia also challenges the agency's decision to award "Karsun a strength for its experience with data transformation and optimization projects at GSA and FAA."  Harmonia's Mot. at 18.  While past performance was not an evaluation factor under the solicitation, Karsun referenced its work with GSA and FAA to demonstrate competence at data optimization.  AR 38-724 to 725.  Harmonia included references to its work at GSA and the United States Treasury Department.  AR 37-625, 628.  However, Harmonia's discussion of its prior experience did not specifically relate to data optimization, but instead included a more general discussion of Harmonia's work on a similar project and its familiarity with GSA requirements.  AR 37-625, 628.  Therefore, Karsun was not awarded a strength for something that was also included in Harmonia's proposal and no disparate evaluation occurred.  Because the proposals were not substantively similar and the agency presented a clear and reasonable rationale for its assignment of strengths, the court will not displace the agency's discretionary judgment.

      Harmonia additionally challenges two strengths assigned to Snap—(1) "for [Snap's] use of AWS Lambda to transfer data for external RESTful APIs," and (2) "for [Snap's] use of serverless technologies like AWS Glue and Athena."  Harmonia's Mot. at 19.  Though Harmonia proposed providing application developers with experience working with AWS, AR 27-647, Harmonia did not propose using AWS Lambda in its technical approach, and thus its proposal and Snap's proposal are not comparable.  Harmonia's challenge to the agency's decision to assign Snap a strength for using serverless technologies also fails.  The agency assigned Snap a strength not only for the use of AWS Glue and Athena, but also for Snap's "technical approach to data transformation [that] discuss[ed] using Big Data techniques and AWS Glue to normalize structured and [un]structured data."  AR 38-1042.  Harmonia's proposal mentions the use of tools including AWS Glue and Athena but does not provide the level of detail included in Snap's proposal, nor did it propose to use the tools in the same manner as Snap.  *Compare* AR 27-635

(Harmonia), *with* AR 29-791 to 792 (Snap). The court concludes that these proposals are not substantively similar, and the agency could appropriately assign strengths to Snap, but not Harmonia, for the technical merit in Snap's proposal.

### C. Price Calculation

Harmonia next argues that the price-calculation method employed by GSA resulted in Karsun's price appearing more reasonable rather than "an extreme outlier." Harmonia's Mot. at 21. By comparing full quotes, including plug numbers, Harmonia avers, the agency masked the "true reflection of the price differences between offerors or the [independent government cost estimate]." *Id.* at 20-21. The government counters that Harmonia's argument is untimely because the price calculation method was specified in the solicitation, and Harmonia did not file a pre-award protest. Def.'s Cross-Mot. at 13-14. The government further contends that the claim lacks merit because it is merely a disagreement about the agency's determination that Karsun's price was reasonable. *Id.* at 15-16. Contrastingly, Harmonia argues that the agency should have evaluated offerors based on their discretionary quotes rather than the total-quote figure that included plug numbers. *See* Harmonia's Mot. at 19-20. Under Harmonia's calculations, GSA should have used the following prices to evaluate price reasonableness: $9,975,694.08 for Karsun, $8,469,461.90 for Harmonia, and $7,794,065.16 for Snap. *Id.* at 20. These numbers are calculated by removing $24,714,469.00 from each quote.[9] *Id.* Harmonia additionally recites the full-priced independent government cost estimate figure of $35,106,463.83, with a discretionary price of $10,389,994.83. *Id.* If the agency had used these numbers, Harmonia argues, the agency would have determined Karsun's price was unreasonable as it was 20 percent higher than the average offer. *Id.* at 21.

However, Harmonia's argument does not persuade. The figure Harmonia states that the agency was required to use does not appear in Harmonia's, or any of the other offerors', price workbook, but rather would require the contracting officer to add together the offerors' proposed "Operations and Maintenance" quotes across the four years of the contract. *See* AR 27-710. Karsun's price offer, while certainly above average among the offerors, was below the government estimate, and therefore unlikely to be found unreasonable, even if the agency had used Harmonia's calculation method. Further, even if the agency erred, it is unlikely that Harmonia was prejudiced by the action. The same plug numbers were used for each offeror so any prejudicial impact would be equally felt by each offeror.[10] Therefore, regardless of the timeliness and waiver issues raised by defendant and defendant-intervenor, the agency acted reasonably in calculating the offerors' proposed prices.

### II. Snap's Contentions

---

[9] Offerors were required to include $24,714,469.00 as a plug number when calculating their total price. *See supra*, at 3 (citing AR 19-403 to 405; AR 21-486).

[10] Additionally, even if the agency had compared only the discretionary prices, there is no indication that the agency would be unwilling to pay a $2.1 million premium for Karsun's superior technical proposal. *See* discussion of the agency's best value tradeoff assessment *infra*, at 14-15.

Snap presents three main challenges: (1) the agency unreasonably assigned Snap weaknesses, (2) the agency improperly evaluated Karsun's proposal, and (3) the agency's best value tradeoff analysis was unreasonable. *See* Snap's Mot. at 9-24. The court finds that each of Snap's arguments, detailed below, lack merit and do not provide grounds to overturn the award to Karsun.

### A. Assigned Weaknesses

Snap challenges three weakness assigned to its technical proposal. First, the agency determined that Snap's "[d]iscussion around mapping sessions . . . does not demonstrate [an] understanding of the [GSA Office of Governmentwide Policy ("OGP")] Data modeling requirement" because "most data comes from source systems of other agencies." AR 38-1043. "[A] literal reading of SNAP's proposal would mean that SNAP would manipulate and pull data from other agencies" which "would [not] be feasible to do under this Call Order." Def.'s Cross-Mot. at 31. Snap's proposal stated that it would "use[] the [Joint Application Design ("JAD")] process to lead data mapping sessions with OGP and identified Source System Owners" which would allow Snap "to obtain information on data exchanges between OGP applications and source systems." AR 29-795. The government argues that agency's interpretation of Snap's proposal was reasonable and the assessment of the weakness was appropriate. Def.'s Cross-Mot. at 30-33.

The government is correct that an offeror has the obligation to establish its capabilities in its proposal, s*ee Software Eng'g Servs., Corp. v. United States*, 85 Fed. Cl. 547, 555 (2009), and that Snap did not clearly define what it meant by "source systems," *see* Def.'s Reply at 11-12. The agency could expressly conclude that Snap's use of the term "source systems" was in reference to the other agencies, rather than, as Snap now contends, *see* Snap's Mot. at 12, data already within the OGP SQL Server database. Snap states that because it "developed the OGP visualization platform and the project plan" it is "illogical" for the agency to determine that Snap did not understand the data modeling requirement. *Id*. at 13. While Snap did write the OGP Visualization Platform Technical Architecture as part of a prior call order, *see generally* AR Tab 19c, the agency was not required to consider that this prior work illuminated the words of Snap's own proposal. Snap may disagree with the agency's assessment, but such a disagreement does not allow a court to displace the reasoned and rational judgment of the agency.

Next Snap avers that GSA should not have assessed Snap a weakness for proposing the use of machine learning "to create all data models for analytics" because GSA's "justification for this alleged weakness incorrectly describes SNAP's quotation." Snap's Mot. at 16. The performance work statement required offerors to propose solutions for data modeling for analysis and advanced analytics. AR 21-468 (Sections 3.4.2-3.4.3). Snap directly referenced these requirements in section 1.1.4.2 of its proposal, titled "Phase #2: Development of ML Models (Data Modeling for Analysis and Advanced Analytics PWS 3.4.2 & 3.4.3)." AR 29-797. The agency stated that "[u]sing machine learning . . . to create all data models for analytics doesn't demonstrate an understanding of the requirement" because "[m]ost data modeling OGP requires does not require [machine learning]" and use of machine learning "is over-engineering the requirement." AR 38-1043. The agency further rationalized the weakness by noting that Snap's proposal did not discuss "multivariate regression or data mining techniques." AR 38-1043.

12

Based on the plain language of Snap's proposal, the agency's interpretation that Snap intended to use machine learning for all modeling required under Performance Work Statement Section 3.4.2 and 3.4.3 was reasonable. The title of Snap's proposal section 1.1.4.2 suggested that the contents were intended to support the data modeling and advanced analytics requirements of the contract. *See* AR 29-797. Snap did not indicate in this section that machine learning models would not apply to all modeling requirements encompassed by performance work statement requirements Sections 3.4.2 and 3.4.3. *See generally* AR 29-797. The agency's interpretation of Snap's proposal, therefore, reflects a reasonable reading. While agencies generally are afforded discretion to evaluate contract proposals, courts must show even greater deference to a technical evaluation "because of the highly specialized, detailed, and discretionary analysis frequently conducted by the government." *CSC Gov't Sols.*, 129 Fed. Cl. at 434. Here, it is appropriate for the court to defer to the agency's expert understanding of its own data modeling and analytics requirements. In the court's view, GSA's rationale to assign Snap a weakness for data modeling is reasoned and supported by the record.

Finally, Snap challenges the agency's assessment of a weakness for proposing a generic senior functional expert. Snap's Mot. at 17-19. Snap stated that it would hire a "Data Scientist" with a bachelor's degree and "7+ years [of] professional experience." AR 29-804. The senior functional expert was noted as "TBD (NON-KEY)." AR 29-804. The agency noted this inclusion in Snap's proposal and stated that "[m]ore functional expertise" was required for successful contract performance, particularly in areas of "IT and other mission support." AR 38-1044. The Performance Work Statement listed skills categories that the agency anticipated as being necessary for the performance of the contract. AR 21-470 to 471. This listing included "Senior Functional Expert." AR 21-470 to 471. The government encouraged offerors to determine appropriate staffing solutions and "explain any solution(s) in sufficient detail that demonstrates clearly the benefits to the Government." AR 21-470. The agency's solicitation provided flexibility to the offeror to propose staffing solutions while allowing the agency discretion to determine whether the offeror's solution would sufficiently meet the contract requirements. The agency, therefore, could critically evaluate Snap's decision to propose a generic senior functional expert and not include additional individuals for "IT and other mission support." AR 38-1044. The agency was entitled to determine that Snap's staffing proposal contains gaps or otherwise could result in risks to the government. The court will again defer to the agency's reasoned judgment. GSA also did not treat the proposals differently as all other offerors provided a specific individual to serve a senior functional expert, Hr'g Tr. 49:8-49 (Dec. 15, 2020), and several of the offerors included individuals with more than 7 years professional experience, *see, e.g.*, AR 27-644 to 649 (Harmonia); AR 28-735 to 740 (Karsun). Therefore, the proposals had material differences and Snap's disparate treatment argument fails.

### B.  *Alleged Improper Evaluation of Karsun's Proposal*

Snap further argues that GSA did not correctly evaluate Karsun's technical proposal. Snap's Mot. at 19-20. Snap contends that its status as the "current incumbent" on the contract, including work on the project preceding call order 2, demonstrates that it, rather than Karsun, was the more appropriate awardee. Snap's Mot. at 20. Karsun, according to Snap, does not possess the relevant work experience to "understand the nature and extent" of call order 2. Snap's Resp. at 18.

13

Snap is correct that GSA referred to Snap as the incumbent. AR 22-491. In its "Questions and Answers" document issued to offerors prior to the solicitation's submission deadline, the agency was asked, "Who is the incumbent?" and provided the answer, "SNAP, Inc." AR 22-491. However, as discussed at both the hearings on the motion for preliminary injunction and that for judgment on the administrative record, Snap does not have employees currently working pursuant to call order 2 nor on its predecessor contract. Hr'g Tr. 33:21 to 24 (Dec. 15, 2020) (Government: "Snap is not currently performing work on this contract."); Hr'g Tr. 93:20-24 (October 22, 2020) (Karsun: "Only Karsun is performing this work . . . . None of the work that [Snap] performed under [its] predecessor BPA is work that's currently being performed under this call order."). Therefore, Snap cannot be considered an incumbent contractor as the term is generally used. Snap is not presently conducting operations on site nor could the predecessor contract be extended for the pendency of the protest to allow continuity of service.

Even if Snap was a traditional incumbent, its challenge cannot be sustained. Past performance is not an evaluation factor under the solicitation. While Snap's work on the prior call order may have provided Snap relevant background and experience, its embedded knowledge does not constrain the agency's independent evaluation of Karsun's proposal or understanding of the project. Snap does not point to a specific component of Karsun's proposal which the agency should have downgraded. *See generally* Snap's Mot. at 19-20; Snap's Resp. at 17-18. While Snap may disagree with the agency's assessment of its own or Karsun's proposals, it does not present evidence that the agency acted irrationally or did not adequately explain its reasoning. Therefore, the court cannot displace the agency's discretionary judgment as to either of Snap's arguments.

### III.   *Best Value Tradeoff Analysis*

Both Harmonia and Snap challenge the agency's best value tradeoff analysis. Harmonia argues that the agency "based its tradeoff decision on arbitrary, capricious, and irrational technical evaluations and an unreasonable comparison of quoted prices." Harmonia's Mot. at 22. Snap bases its best value tradeoff argument on the contention that the agency "failed to consider SNAP's strengths" and "did not meaningfully consider SNAP's lower price." Snap's Mot. at 22. Had the agency properly evaluated their proposals in its best value tradeoff, both Harmonia and Snap contend that the agency would have come to a different result. Harmonia's Mot. at 22-24; Snap's Mot. at 20-24.

Because the solicitation required a best value analysis, GSA stated that it would weigh "both price and non-price factors," AR 19-381, but would consider the technical factor to be "more important than cost/price," AR 20-440. The agency has significant discretion to balance the factors and determine the best value to the government. *AgustaWestland*, 880 F.3d at 1332. The court may not "substitute its judgment for that of the agency," *Hyperion*, 115 Fed. Cl. at 550 (quotations omitted), when the agency provides "a coherent and reasonable explanation" for its decision, *id.* (quotation omitted). As previously discussed, the agency did not act arbitrarily or capriciously in awarding weaknesses, strengths, or otherwise rating Harmonia's, Snap's, or Karsun's proposals. *See supra*. Therefore, the court must determine whether the agency could

14

reasonably award the contract to Karsun based on the offerors' respective ratings and price quotes.

Karsun received an excellent technical rating and offered a price of $34,692,163.08, Harmonia received a good technical rating and offered a price of $33,185,930.90, and Snap received a good technical rating and offered a price of $32,510,534.16. AR 40-1073. In its Award Decision Memorandum, GSA first evaluated Snap and Harmonia head-to-head to determine which offeror that received a good rating provided the best value to the government. AR 40-1074 to 1075. As stated in the solicitation and referenced in the Memorandum, the price difference "increase[d] in importance in the award decision" when evaluating offerors obtaining the same technical rating. AR 40-1074. The contracting officer determined that because "Snap's price [was] 2.04% or $675,396.74 lower than Harmonia, [Snap] represent[ed] a better value to the government." AR 40-1074. With similar number of strengths and weaknesses and an overall good technical rating, the agency could reasonably determine that the offeror with a lower price represented a better value to the government.

The agency then conducted a direct comparison between Karsun and Snap, noting that Karsun was awarded an excellent rating, two significant strengths, thirteen strengths, and no weaknesses, and Snap was awarded a good rating with no significant strengths, eight strengths, and three weaknesses. AR 40-1075. The contracting officer stated that Karsun's price was $2,181,628.92, or 6.71 percent, more than Snap's price. AR 40-1075. In finding that Karsun represented the best value to the government, the contracting officer noted that Karsun was the only offeror that received an excellent rating and was accessed zero weaknesses, which "markedly distinguish[ed] it from all other competitors." AR 40-1075. Ultimately, the agency deemed $2.1 million in additional price to be "an acceptable price premium for the superior technical solution." AR 40-1075. The agency possesses substantial discretion to weigh factors and determine the best value to the government. *See AgustaWestland*, 880 F.3d at 1332. Here, GSA reasonably could determine that Karsun's superior technical rating warranted paying a higher price. Further, GSA clearly stated its reasoning for determining Karsun's offer was the best value for the government. *See* AR 40-1075. Therefore, the agency's award to Karsun was an appropriate use of the agency's discretionary judgment which the court cannot set aside.

## CONCLUSION

For the foregoing reasons, Harmonia's and Snap's motions for judgment on the administrative record are DENIED, and defendant's and defendant-intervenor's motions for judgment on the administrative record are GRANTED. Harmonia's and Snap's motions for a preliminary injunction, respecting which the court previously deferred decision, are DENIED.[11] The clerk shall enter judgment accordingly.

---

[11] As noted above, *see supra*, at 2 n.2, Snap's motion to supplement to court record, *see* Pl. Snap's Mot. to Suppl. the Ct. R., is GRANTED.

15

No costs.

It is so **ORDERED**.

                                                s/ Charles F. Lettow
                                                Charles F. Lettow
                                                Senior Judge